Your Honor, this is the first case in the morning, call 209-88, People v. State of Illinois v. Lorenzo J. Gonzalez. On behalf of the appellate, Mrs. Bryson, on behalf of the FAA, Mr. Vance. Good morning, Counsel. Good morning, Your Honors. May it please the Court, Counsel, I am Carrie Bryson, I represent Lorenzo Gonzalez in this appeal. This is the appeal from the third stage denial of Mr. Gonzalez's post-conviction petition following an evidentiary hearing. At the hearing on his petition, the defendant presented two new witnesses, witnesses who were not heard at trial. While both of those new witnesses support the defendant's claim that he is actually innocent of this offense, they come before the court in different ways. One is a direct claim of actual innocence, the other is brought before the court as a claim of ineffective assistance of counsel, because it is a witness who apparently was known to trial counsel at the time, and that trial counsel did not present. Either can support on its own the basis for a new trial, but considered together, they provide even stronger support for that proposition. I'd like to talk about them in turn. First, James Lewis, the witness who is brought before the court as a direct claim of actual innocence. Mr. Lewis signed an affidavit and sent it to the public defender's office in February of 1999, which was a little over a year after the defendant was convicted in this case. And in that affidavit, Mr. Lewis claims sole responsibility for committing the offense. He said the defendant had nothing to do with it, was not involved in the planning, was not present during the commission of the offense, simply was not involved. Mr. Lewis has accepted full responsibility. How long after Mr. Lewis was convicted did he come forward? Mr. Lewis's conviction was also entered in December of 1997, so it was about 13, 14 months after Mr. Lewis pled guilty.  They were held in separate courtrooms, but the trials were ongoing at the same time. Mr. Lewis's trial ended in a hung jury and a few days thereafter he entered a plea to the offense in exchange for a 25-year sentence. Now, weren't the facts that were contained in that affidavit known at the time of the defendant's trial? I don't think that they were known at the time, not to the defendant, because the affidavit says the defendant wasn't involved, wasn't involved in the planning, wasn't involved in the participation, didn't participate in the offense, wasn't there. It's not the kind of a case where a co-defendant might come forward and say, well, the defendant was there, but he didn't know what I was going to do, or a drug case where the co-defendant says, well, the defendant was there, he was with me, but they were all my drugs. This is the kind of case where this co-defendant is coming forward saying he wasn't there, he wasn't involved, he didn't plan this. So I think it's different from the cases where the defendant might know that there is an available source of this evidence and who it is. If the defendant didn't do this, wasn't present, wasn't involved in the planning, then we can't infer that he would have known that Lewis did and that Lewis was an available source of that evidence. But what, you know, Lewis waited several years, two years after he pled guilty, two years after he was sentenced. He was scheduled to be released from prison. Now he comes forward. I know that you rely on Malstead, but can't you distinguish Malstead and the fact that the folks in Malstead actually were guilty or either convicted or pled guilty, but this was prior to sentencing? No, it is different. I mean, it's not identical to Malstead. But Lewis had made his deal. The defendant doesn't have any control over that. You know, Lewis gets a hung jury, gets a mistrial, decides he better take a plea. Maybe he sees the writing on the wall and he does so and then later comes forward. That's out of the defendant's control, especially if the defendant doesn't know that Lewis is the person, you know, where he's seeking this evidence or to try to get him to come forward. Well, what did Lewis give up or what was the risk that he faced? I mean, the real risk Lewis is facing is a perjury charge. But again, he pled guilty, he was in prison. I mean, is that a real risk? It's a risk. And so therefore, what about that fourth point? Right. That's required in order to show actual innocence. It isn't here, is it? The fourth point being? Being there, that's talked about for a claim of actual innocence. Right. It is, like you say, it is different from Malstead. It would be great if it were identical. Unfortunately, it's not. Yes, Lewis had already pled. He's doing his time and he comes forward. He comes forward shortly after, I mean, 14, 15 months after. You know, the judge points to at the hearing on the petition, the judge thought it was suspect, the trial judge, because he was just about due to be released. But the affidavit was given nearly 10 years earlier when he wasn't just about due to be released. He was still, I mean, he could have been subjected to perjury charges. That's the risk that he faced in this case. And it is a risk. I mean, it could have incurred him additional prison time. As for why he would come forward and say this if he wasn't the person who actually did it, I mean, I don't know what the bias would be of why he would be so willing to come forward and accept full responsibility for this and let the defendant go if he wasn't. I mean, he wasn't facing anything. So, therefore, I guess this bears on the credibility of Lewis and the conclusive nature of this evidence. Sure. And it does affect his credibility, and certainly that would be something that would be brought up at a new trial. But this isn't also the kind of case where the state's witnesses were beyond reproach in the credibility department. You know, this was a relatively close case. Does the trial court rule upon the credibility of this witness, and how should we deal with that when we look at the fourth prong of the case? The trial court, I mean, it is a manifest error standard, and the trial court did make a credibility finding against this witness, citing biases that he believed the witness had, but not really specifying what those were. I mean, if it's a friend, is that enough of a bias for you to come forward and accept full responsibility for a murder and let the friend walk? Excuse me, can you keep your voice up, everybody? There's a fan on the ceiling here that makes it hard to hear. All of us need to speak a little louder. Go ahead. Are you saying that the trial court did not make a specific ruling as to why this person was not credible? I mean, the trial court said he didn't believe that Lewis was credible, that he had biases. The trial court cited to the fact he was due to be released from prison soon, which, again, I think is questionable in light of the fact that this witness had come forward nearly 10 years earlier with the same story. It's not like on the eve of being released from prison he's coming forward and saying, by the way, it was only me, he said it earlier. So I don't know that that's necessarily something that should detract from his credibility as heavily as the trial court may have considered it. Was this the trial court that heard the trial? It is not. It is not the same judge who heard the trial. So in terms of evaluating the credibility of the state witnesses that testified at the trial, I mean, this judge on post-conviction is really in the same position that we are in looking at the credibility of those witnesses. Now, yeah, the judge heard live testimony from Lewis and from Plante, but he did not, this is not the judge who heard the live testimony at the trial of the state witnesses. But the jurors heard that live testimony. The jurors did hear that live testimony, and the jurors took 10, 11 hours to return a verdict after several questions, after a prim instruction. You know, clearly this was a close case, and those state witnesses at trial have significant credibility problems. You know, Stephen Klingel, who really is the state's key witness, comes forward on the day he's set to go to trial on his own felony charges. He's facing 14 years of imprisonment. Rather than show up at the courthouse on his case that's set that day, he goes to the police station and says, oh, hey, I want to, you know, I want to cut a deal. And the police station, the police department, they call the state's attorney to get the case continued. Ultimately, he doesn't serve a day in jail. You know, and he's facing, at the time he was facing, 14 years and a petition to revoke probation on another case. Did the court specifically comment on the testimony of Rodriguez and Garcia, who had put the defendant at the scene that morning? They didn't really put the defendant at the scene. Nobody puts the defendant at the scene of this offense. You know, this occurs in the area, which would contradict his, would contradict Lewis, would contradict his statement to the police. One witness, one neighbor, put him in the area. Another couldn't say for sure that it was him. But they were wearing the same clothing. Again, it's not really consistent, and it's kind of vague. You know, we're talking about young men in dark-colored hoodies or, you know, starter jackets, cowboy jackets, white sex jackets, jeans. I would suggest it's nothing unique about what those witnesses described. But is there enough there, enough vagueness there for us to reverse the whole conviction? That's the question. Is there enough there? Wasn't there some testimony before the trial court in a cross-examination, I believe, of Lewis? Wasn't the family of the defendant in this case putting money in Lewis' account in prison? I don't recall that testimony. I'm sorry if I'm— You know what? I may be confusing you with another case, but I thought that there was testimony concerning that issue. I don't recall that testimony. Again, if I'm— The court had to take into consideration, as Justice Burke points out, all of the testimony that it has heard and weighs the bias and the prejudice of the witnesses as well, those that testified before the court, in order to afford this actual innocence claim. And he made, in my opinion, a pretty complete finding. Maybe he didn't make the finding of Klingel because you didn't see him or the sister. But, I mean, how do you expect that we find actual innocence based on what happened in the other trial? Are we to look at the credibility of the witnesses in the other trial? I think so, because what we have to do is balance the new evidence against the evidence that was presented at trial. I mean, this is not the stage where we have to find that this defendant was, in fact, actually innocent. And I think there's language from Molstad. And, again, I know Molstad is distinguishable, but the principles apply. You know that, of course, in Molstad, the court said, of course, this doesn't mean he's innocent. Merely that all of the facts and surrounding circumstances, including the testimony of the new witness, should be scrutinized more closely to determine the guilt or innocence of the defendant. So we do look to what was presented at the trial. It is a balancing, and it's a question of is there enough here to warrant the new trial, not is there enough here to let this defendant go home and not face a new trial. But is closer scrutiny warranted in light of the new evidence considered with the evidence that was presented at trial? So we do think it's relevant, you know, the evidence that was presented at trial. And the credibility determinations by the trial court are very relevant and very important as well, correct? Well, certainly. And, I mean, I understand, you know, we're facing a situation where a jury convicted this defendant. You know, albeit it took some time and the giving of a print instruction, this jury did convict this defendant. That's not necessarily prohibitive of getting a new trial based on a claim of actual innocence. It happens. It can happen. And I submit this is the sort of case where it should happen. Because if Lewis is coming forward and what he's saying is true, this defendant is actually innocent. I mean, it is total vindication. The evidence he's offering is evidence of total vindication. At the trial, his defense was what? And what was argued at trial? Well, at the trial, the defense didn't, they didn't put on, you know, their own defense. It was to subject the state to its burden of proving beyond a reasonable doubt. So that's what was argued, that they hadn't, the state hadn't sustained its burden. Correct. Correct. So there was nothing about, it was Lewis who had done it and he hadn't done it. None of that came out. So, therefore, there could be no claim that there was not due diligence. Right. That was not a defense that was presented. I mean, there was cross-examination of the witnesses in terms of, you know, what they saw. Some witnesses brought forth evidence, you know, that would tend to suggest Lewis was involved, but the defense didn't put any of that kind of evidence on. Okay. You know, that kind of segues into the claim about the second witness. You know, the defense didn't bring forth this alibi witness, who apparently was known to the defense attorneys and defense investigator at the time, who would have said the defendant was home that morning. He was home with me and his nephews and our son. But they made a strategic, well, you guys said the same thing, strategic decision. Sure. And there was talk about whether that, you know, was a strategic decision. Again, it doesn't insulate the decision from review. If the decision was made without a complete or thorough investigation, which I think. But there was an interview, was there not, by the public defender's investigator? There is testimony that the public defender's investigator did interview the witness. The public defender, one of the two who represented the defendant at his trial, testified at the post-conviction hearing and said, well, having heard what she has to say, I think she could have made a difference with regard to the alibi witness. So whether or not that was a good strategic decision or it was an actual well-informed, I guess is what I'm saying, a well-informed strategic decision, I think is questionable. But also, it can be bad strategy. If it was a strategic decision that reasonable, you know, representation wouldn't have undertaken, then, you know, that's deficient. How was the investigation? Well, I mean, for counsel to come forward at the post-conviction hearing and say, well, now hearing what she has to say, I think she could have made a difference. Well, counsel should have known what she had to say. To me, it suggests that either there was not a thorough, you know, investigation into what she would have said or wasn't communicated to counsel. Counsel wasn't fully aware of what this witness had to offer. That's deficient. Because this alibi would have been consistent with the defense that I wasn't there. Didn't the trial court say that this witness was inconsistent between direct and cross? The trial court did, not on a point with regard to whether or not the defendant was or was not with her, was or was not present. I see. But on a collateral point to whether she had talked directly to the defense attorneys or not prior to trial, not asked to whether or not the defendant was actually with her that morning. There was no wavering on that point. Is that my time? It is, but you will have time on your back. I have one thing to say, though. People versus Gabriel, 924 Northeast 2nd, 1133. They put $600 in the account. Okay. So I apologize. No problem. I've been a little upset if I missed it. Thank you. Thank you. Mr. Mansfield. Thank you, Your Honor, counsel. Let me begin with two comments. One, I thank you for rescheduling the argument to this morning from mid-December. I had nonrefundable airline tickets to Tulsa, Oklahoma, to visit an about-to-be-three-week-old granddaughter. Congratulations. Number two in the family, other son. So each son and his wife have blessed us with a granddaughter. And I thank you for this morning. You're welcome. Thank you. And I also have, more importantly, an apology to offer to you and to counsel. While preparing the state's brief on argument 1C4 on page 18 and 19, beginning at the bottom of page 18, please take out your red magic marker and write, Mr. Mansfield messed up and confused Willis with the defendant. That argument is, with my apologies, totally suspicious and incorrect. I, for reasons I do not understand, but I will blame on antiquity, at least my own antiquity, that I misread the record, and I do apologize to the court and counsel. Thank you. Now, thank you. And I do regret that I am deeply embarrassed. Thank you, counsel. Thank you. In October of 2003, this court remanded the post-conviction proceeding to the trial court for an evidentiary hearing to determine if the newly discovered evidence, specifically Lewis's affidavit, is of such conclusive character that it would probably change the result on retrial. The state's argument here, of course, is that the affidavit is not, and that his testimony at the evidentiary hearing is not sufficient to warrant retrial. Now, as an aside, let me point out that Lewis may well have been available to testify at the defendant's trial. I don't know the precise timing of the two trials other than that they overlapped, and from the record I understand they were in different courtrooms in the same building on the same days. If that is so, then Lewis, by testifying at his trial, waived his Fifth Amendment privilege against self-incrimination and could have testified at defendant's trial. Now, I could not find in the record sufficient timing, calendar days, things like this, to be absolutely certain. But since that question did come up of what Lewis did, did he testify, it is at least potentially relevant. I'm sorry? What would the relevance of his testimony be at this defendant's trial if, in fact, at his trial, he testified that I wasn't there, I had nothing to do with it, I don't even know what you're talking about? Why would then this defendant call him to say that? It would be totally irrelevant. I have no idea why he would say it, but it becomes relevant in the issue of whether this is newly discovered evidence, because essentially it would then be a recantation which courts look upon with a jaundiced eye, let me say. Now, recantations can be accepted and can be material, but the recantation itself would have made it incredibly dubious. Well, that gets back to the fourth factor, then. In these four factors that you're talking about, the three factors are there, aren't they, the first three factors? I think they are. I think they are. I think they are. I certainly can't and will not argue that they are not. I simply brought up Lewis's testimony because part of the argument that I thought I heard was that he wouldn't testify at the defendant's trial. Well, perhaps he could have because he had already waived, if he had already waived his Fifth Amendment right. Now, you are, of course, correct, Your Honor, that in all likelihood, having told one jury I didn't do it, he's not going to go into the adjoining courtroom the next morning and say, yeah, actually I did, but I don't tell them next door. No. We at counsel agree that credibility determination is as important as made by the trial court. Yes. We must take that into consideration. Should they also look at the credibility of the witnesses that testified at the trial, such as Kringle, who asked for a share of the money according to the defendant? Oh, of course. That is a credibility issue. Why is a person testified? That is a fair consideration to take into the balance when saying he's credible, he's credible, he's not credible in terms, particularly in terms of the critical aspects of their testimony. The jury and the trial judge, not the post-conviction judge, let me be clear here. At trial, everyone in the courtroom was fully aware of everybody's credibility defects, the chinks in their golden armor or whatever you want to call it. By the time of the post-conviction hearing, we were before a different judge, but that judge had access to the trial record. It was argued who was and was not credible, and that judge was in a very good position, a responsible position to decide what is the credibility. Not only did that judge decide that Lewis, based simply on defects within his own testimony and inconsistency with his own testimony, but also with regards to the alibi witness, that neither one were credible. Neither one were credible. Now, again, what can I say? We all knew there were defects. We all knew there were problems. But what I will argue is that what defendant has pointed out to this court with regards to, let's say, the testimony of Sonia Garcia, the 15-year-old daughter of Irma Rodriguez, who lived next door to Klingel and Jennifer Lewis, and the testimony of Esmeralda Avia, who lived some six doors or so from the victim on Jungles Avenue, the differences that were being told about here do not go to their credibility but to the weight of the evidence. Their credibility issues are, as Justice Shostak pointed out, they were paid. They got remuneration for their expenses. They got reimbursed for their expenses for coming to trial. Klingel got a sweetheart deal. He apparently was facing consecutive maximum seven-year terms for basically stealing cars, putting them on a tow truck and hauling them off and letting his owner charge towing fees from parking lots, a scam. But that credibility concern was before the trial court and before the post-conviction court. So what we're looking at was the jacket, royal blue or dark blue, things like this, details in testimony that was given perhaps some 11 months after the fact. Observations, not one of which at the time would certainly strike me as important to have made. This was the January 15th observations by these three women. Why would they remember who saw what when? Only after hearing about the murder would Ms. Avila think, oh, maybe I saw something important. She saw the descriptions. So we're looking at observations of events that at the time would not appear to the average observer as important to remember, certainly in detail. So this is this argument then goes to the weight of the evidence. Talking about the weight of the evidence and let's talk about the weight of the evidence in plant and your opponent's allegation of ineffective assistance in not calling her plant plant. Oh, OK. Without intending to waive the argument that the trial court was without authority to hear plants argument. OK, no jurisdiction because that was not part of the remand. Let me suggest the fundamental fundamental problem with plant testimony is twofold. One is the court observed what she said on direct exam was then contradicted by what she told the court on cross examination. Most importantly, I think, is that she told the court repeatedly that defendant was with her from 10 to 12 in the morning playing basketball with son and two nephews. My battery just died. Apologies. I still have one, but maybe it's better that way. I don't just hear in stereo. But what did defendant on January 21st of 1996 tell the police he was doing the morning of January 15th, the morning of the murder? He told police he was sleeping in that he slept in that morning till noon or thereabouts. So we have albeit hearsay, we have the statement that he gave police that I slept in. He had no alibi. He offered them no alibi. And I can well imagine a freshman prosecutor saying, well, why didn't he just tell the police the alibi at the time? And the freshman prosecutor, being freshman and liking to answer their own questions, would say, because he didn't have one. Because he didn't have one. You're formulating a question, Your Honor. No, that's fine. I'm listening. That's good. Going back to, you said you didn't want to waive the issue of jurisdiction. Didn't you, didn't the state at the time have no objection to the amendment? That is correct. That is absolutely correct, Your Honor. The state did not. And when I catch up with the prosecutor, well, actually it was Chuck Colburn from our office because it's a special prosecution. I'm going to smack him upside of the face. However, as you, I'm sure you're about to, you've heard many times, jurisdiction can never be waived or forfeited. So the failure of the state to recognize the problem at the time does not do away with the problem. It does not give the trial court jurisdiction to have done what it did. Therefore, what it did in terms of allowing the amendment to the pleading and testimony is, lovely Latin phrase, void ab initio. It is void. Do you have other questions? Something that I can clarify or let me know. Counsel relies on Molstad. You didn't really talk about Molstad in your briefing. Why? The law is the law. I mean, Molstad very validly stated the law that we must all follow. Here, we do not have any of the situations that the Illinois Supreme Court in Molstad and in some successor cases has looked at as saying, yes, this is newly discovered evidence. Yes, if presented to the jury on retrial, it well could change the result. Here, because of the lack of credibility of Willis, I think that's not possible. We have three independent witnesses, Sonia Garcia, Irma Rodriguez and Esmeralda Avila, who saw a defendant and another person together the morning of the murder. This totally refused Willis's statement. Willis's statement. We also have his own sister saying, yeah, he was in my house till about 9 or got up about 9 or 10 that morning. Defendant came over. They left together in defendant's car to get cigarettes. The car is variously described as a black 1978 Pontiac Grand Prix or a Chevrolet Monte Carlo, which are the same car except for the nameplate. So we have at least three independent witnesses. We have a sister who is saying I saw them together. So I think there's no way that this information could change the result on retrial. And how long after the murder did the sister make that statement? On June 21st, the murder was on on January 15th. On June 21st, Klingel went to the police the same day he should have been in court and he managed to get that postponed. The same day, June 21st of 96, Jennifer Lewis was interviewed by the police. June 21st, her brother Jimmy or James Lewis was arrested and the defendant was arrested. So it was five months later. Thank you. Five months. Thank you. Counsel. Thank you. And again, thank you for the courtesy of today. Mrs. Bryson. Thank you. I'd like to begin by addressing the issue about the amendment. I really think this is a jurisdictional issue as we define jurisdiction. You know, the Supreme Court, as recently as a couple weeks ago, and Luis R. again talked about, and they've talked about a few times recently, what's jurisdiction? Well, is there subject matter jurisdiction and is there personal jurisdiction? Certainly there was both of those things in this case. The court had jurisdiction over the post-conviction petition in the criminal case. The parties were before the court in person. There was jurisdiction. The amendment isn't void. It was the court's discretion to allow amendments. The court opted to allow the amendment here. For any host of reasons, that was a good decision. Without objection by the state. And this court should go on then to consider the substance of the witness that was offered through that amendment. With regard to the substance of the testimony, just to touch back on a couple of points. You know, we talk back again about the trial evidence and the credibility problems and the weight of the evidence. Those were things that were before the jury. And were not before the court raising a reasonable doubt argument. It's not that standard. Was the evidence sufficient to convict at the time? The standard, again, and the question is, in light of the new evidence, should there be a re-weighing of both the trial evidence and the new evidence? Both Lewis and Suzanne Plant and her alibi testimony. Yes, there should. Now, counsel questions the defendant's statement when he was interviewed by police about where he was that morning. The morning of January 15th. And he said the defendant said he slept in. Actually, what the defendant said is, he usually sleeps till noon. That doesn't necessarily mean that every single day, that was what he was saying, he slept till noon on that day. What he said, and it's at 9.32 in the report of proceedings, Officer Gower testified that what the defendant told him was, he usually sleeps until noon. Maybe he also did not recall the events of that day. Because at the time, it wasn't noteworthy to him to consider where or what he was doing if a crime was being committed that he wasn't involved in and didn't know about. So the same things that counsel points to with regard to the neighbors and their observation may have been true of the defendant's perhaps lack of clarity as to exactly where he was that morning. When did she first tell anyone this, I wouldn't say story, but her story about the defendant playing basketball with his nephews and son? There is some evidence that it was known to trial counsel before trial as to what date exactly she came forward or who exactly she first presented that to. It's not entirely clear on what date. Again, Justice Shostak, you pointed out, there's delays everywhere. The state's witnesses come forward five months later. They were questioned by the police two or three weeks after this incident. They were interviewed. They didn't tell the police anything at that time. They waited until there was money to be had and gain to be had in terms of a deal for Stephen Klingel to come forward with this story. Again, I would ask the court to look at Molstad. I know it's not exactly similar, but the principles there should guide the decision in this case. This new evidence is significant. It goes directly to the defendant's actual innocence. It is total vindication. It is evidence in the form of total vindication. And I would submit to this court that there ought to be a reweighing, a retrial, where both the new evidence and the trial evidence can be presented to a trier of fact. If the court has no other questions, I'd ask you to reverse the denial of the petition. Thank you. Thank you very much, counsel. At this time, the court will take the matter under advisement and render a decision in due course.